## IN THE CURCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
## IN AND FOR DUVAL COUNTY, FLORIDA

|  |  |
|---|---|
| JOHN STEPHENS, | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ANGUS INTERNATIONAL SAFETY GROUP, LTD; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CENTRAL SPRINKLER, LLC; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; FIRE PRODUCTS GP HOLDING, LLC; JOHNSON CONTROLS INTERNATIONAL PLC; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|  | ) |
|     Defendants. | ) |
|  | ) |

Document

## PLAINTIFF'S COMPLAINT

Plaintiff John Stephens, by and through undersigned counsel, brings this action against 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Angus International Safety Group, Ltd., Archroma Management, LLC, Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Central Sprinkler, LLC, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Fire Products GP Holding, LLC, Johnson Controls International, plc, Kidde PLC, Inc., Nation Ford Chemical Company, National Foam, Inc., Raytheon Technologies Corporation (f/k/a United Technologies Corporation), The Chemours Company, The Chemours Company FC, LLC, Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), UTC Fire & Security Americas Corporation, Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## I.    SUMMARY OF THE CASE

1.    Plaintiff John Stephens brings this action against Defendants for exposure to aqueous film-forming foam ("AFFF") resulting in personal injury. For 22 years, Mr. Stephens was enlisted in the United States Navy. During that time, he worked as a fireman in an engine room and in an AFFF transfer station. On his first ship deployment, Mr. Stephens was bunked in a birthing compartment directly adjacent to the AFFF station. He regularly handled and was exposed to AFFF which contained per and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").

2.    PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are

firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

3.    PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

4.    At various times from the 1960s through today, Defendants designed, manufactured, marketed. distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluourinated chemicals contained in AFFF.

5.    This Complaint refers to AFFF. PFOA, PFOS, PFAS compounds, and fluorosurfactants collectively as "Fluorosurfactant Products."

6.    Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the knowledge that firefighters would be exposed to these toxic compounds during fire protection, training, and response activities even when the AFFF was used as directed and intended by the manufacturer.

7.    After working with AFFF for many years, Mr. Stephens was diagnosed with testicular cancer, hyperthyroid disease, and sterility.

8.    Plaintiff files this lawsuit to recover compensatory and all other damages, including but not limited to past and future (1) expenses for care, treatment and hospitalization incident to the injury; (2) compensation for physical pain and suffering; (3) loss of income, wages, or earning

capacity; (4) compensation for mental or emotional pain and anguish; (5) physical impairment; (6) loss of companionship and society; (7) inconvenience; (8) loss of enjoyment of life; (9) exemplary damages.

## II.    PARTIES

*A.*    *PLAINTIFF*

9.    John Stephens is a resident of Jacksonville, Florida.

10.    From March, 1979 to 2001, Mr. Stevens works as a Navy fireman. He worked in an engine room, where he used AFFF to cover oil/fuel spills in the engine room bilges. Mr. Stephens also lived in a birthing compartment directly adjacent to the AFFF transfer station, which would regularly overflow and leak during maintenance or operation. He also worked in the AFFF transfer station, where he physically cleaned up spills of AFFF with mops and sponges.

11.    Mr. Stephens regularly handled, used, and cleaned up AFFF as part of his regular duties. Throughout the course of these activities, Mr. Stephens used AFFF in accordance with all product instructions and directions.

12.    During all times relevant to this lawsuit, the Navy used AFFF containing PFAS compounds.

*B.*    *DEFENDANTS*

13.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products to which Plaintiff was exposed.

     a. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Florida, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.

3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including in Florida.

b. Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont is registered to do business in Florida.

c. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in the State of Florida.

d. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e. Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Florida.

f. Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc.

5

was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). New DuPont is registered to do business in Florida.

g. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Florida.

h. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Florida. Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of Florida.

i. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is registered to do business in Florida.

j. Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon

6

information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in Florida.

k. Defendant Johnson Controls International, plc is an Irish public limited company with its principal place of business located at One Albert Quay, Cork, Ireland. Upon information and belief, Johnson Controls International, plc is the parent company of Tyco.

l. Defendant Central Sprinkler, LLC is a Delaware limited liability company with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania, 19446. Upon information and belief, this Defendant is a limited partner of Tyco. Upon information and belief, Chemguard is wholly-owned by Central Sprinkler, LLC. Upon information and belief, Central Sprinkler, LLC has conducted and/or availed itself of doing business throughout the United States, including in Florida.

m. Defendant Fire Products GP Holding, LLC is a Delaware limited liability company with its principal place of business located at 5757 N Green Bay Ave., Milwaukee, Wisconsin 53209. Upon information and belief, this Defendant is a general partner of Tyco. Fire Products GP Holding, LLC is registered to do business in Florida.

n. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

7

o. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

p. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in Florida.

q. Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in Florida.

r. Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, Massachusetts 02451. Raytheon Tech f/k/a United Tech is registered to do business in Florida.

s. Defendant National Foam, Inc. is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. Upon information and belief, National Foam, Inc. is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam, Inc. manufactures the Angus brand of AFFF products. Upon information or belief,

National Foam, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

t. Defendant Angus International Safety Group, Ltd. is a foreign private limited company, United Kingdom registration number 8441763, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom. Upon information and belief, Angus International Safety Group, Ltd. is the parent company of National Foam, Inc.

u. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Upon information or belief, Buckeye has conducted and/or availed itself of doing business throughout the United States, including in Florida.

v. Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is registered to do business in Florida.

w. Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF Corporation acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF Corporation is registered to do business in Florida. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals conducted and/or availed itself of doing business throughout the United States, including in Florida.

x. Defendant ChemDesign Products, Inc. is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon

information and belief, ChemDesign Products, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

y. Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Florida.

z. Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, Chemicals Incorporated has conducted and/or availed itself of doing business throughout the United States, including in Florida.

aa. Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company has conducted and/or availed itself of doing business throughout the United States, including in Florida.

bb. Defendant AGC Chemicals Americas, Inc. ("AGCCA") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGCCA is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. Upon information and belief, AGCCA has conducted and/or availed itself of doing business throughout the United States, including in Florida.

cc. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States.

10

AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

dd. Defendant Deepwater Chemicals, Inc. is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater Chemicals, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

ee. Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, Dynax Corporation has conducted and/or availed itself of doing business throughout the United States, including in Florida.

ff. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

gg. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC. Upon information and belief, Archroma U.S., Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

hh. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities

of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

14.     All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the state of Florida.

15.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

16.     The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action because this is an action for damages in excess of thirty thousand dollars ($30,000.00).

18.     Venue is appropriate pursuant to Fla. Stat. § 47.011 because a substantial part of the events and omissions giving rise to Plaintiff's causes of action accrued in this County, and because the property and resources affected by Defendants' conduct are located in this County.

## IV.    FACTUAL ALLEGATIONS

A.    THE CONTAMINANTS:  PFOA & PFOS

19.    PFOA and PFOS are stable manmade chemicals in a family as PFAS.  Each is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent.  PFOA and PFOS contain eight carbon-fluorine bonds.  For this reason, they are sometimes referred to as "C8."

20.    PFOA and PFOS do not occur in nature.  Rather, they are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation.

21.    PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure, dermal exposure, or inhalation, and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, and air, as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

22.    PFOA and PFOS are persistent in the human body.  A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

_____

[1] See Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances and Your Health," available at https://atsdr.cdc.gov/pfas/index.html (last accessed July 12, 2022).

[2] See EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R- 16-005 (May 2016) at 55, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf (last accessed July 12, 2022) EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16-004 (May 2016) at 55, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_health_advisory_final_508.pdf (last accessed July 12, 2022).

23.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

24.     According to the EPA, "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[3]

25.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[4]

26.     The EPA has issued Health Advisory Levels for PFOA and PFOS found in drinking water of .004 parts per trillion ("ppt") and .02 ppt, respectively.[5]

27.     The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiff exposure to PFOA and PFOS, which caused Plaintiff's conditions.

B.      *AQUEOUS FILM-FORMING FOAM*

28.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires. It is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF

---

[3] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (last accessed July 12, 2022).

[4] *See* EPA, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed July 12, 2022).

[5] *See* EPA, "Drinking Water Health Advisories for PFAS Fact Sheet for Communities," available at https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf (last accessed July 12, 2022).

works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion. AFFF is typically sprayed directly onto a fire.

29.    The AFFF products made by Defendants contained either or both PFOA and PFOS.

30.    The AFFF produced, marketed and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.

31.    Upon information and belief, from 1960s through the mid-2000s, 3M manufactured, designed, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors within the United States and raw materials containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

32.    All other Defendants used telomerization to produce AFFF; fluorochemicals made through telomerization degrade into PFOA, but not PFOS.

33.    Upon information and belief, by the early 1970s, National Foam and Tyco/Ansul began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States.

34.    Upon information and belief, by the 1980s, Chemguard began to manufacture, design, market, distribute, and/or sell AFFF containing PFOA and/or its chemical precursors within the United States, and fluorosurfactants containing PFOA and/or its chemical precursors within the United States, and fluorosurfactants containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

35.    Upon information and belief, by the 1990s, Buckeye began to manufacture, design, market, and/or sell AFFF containing PFOA and/or its chemical precursors withing the United States.

36.     When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters).  When using AFFF, firefighters may absorb PFOA and PFOS through their skin, inhale PFOA & PFOS compounds, or inadvertently ingest PFOA and PFOS compounds.

37.     PFOA & PFOS accumulate in the human body and may cause serious injuries.

38.     AFFF can be made without PFOA and PFOS. Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health threat to firefighters.

C.     *DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS*

39.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when AFFF was used per the instructions given by the manufacturer, firefighters would be exposed to PFOA and PFOS at levels sufficient to cause harm to human health.

40.     Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the skin, lungs, and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

41.     In 1980, 3M published data in peer-reviewed literature showing that humans retain PFOS in their bodies for years.  Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from the body after all exposures had ceased.[6]

---

[6] *See* EWG, "New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed July 7, 2022) (in particular, please refer to the "Letter from 3M to Office of Pollution Prevention and Toxics," referenced in the online article).

16

42.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects.  Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

43.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia.  DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect and one a nostril and eye defect.[7]

44.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[8]

45.    Based on information and belief, in 2000, under pressure by the Environmental Protection Agency ("EPA"), 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

46.    After 3M exited the AFFF market in the United States, the remaining AFFF manufacturer Defendants continued to manufacture and sell AFFF containing PFOA and/or its chemical precursors.

47.    From 1951 onward, Dupont, and on information and belief, Chemours, designed, manufactured, marketed, and sold products containing PFOA, including Teflon nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N. for the use in the manufacture of AFFF products.

---

[7] *See id.* (specifically, please refer the "C8 Blood Sampling Results, Births and Pregnancies" Memorandum referenced in the online article).

[8] *See id.* (particularly, please refer to the "Organic Fluorine Levels" Memorandum referenced in the online article).

48.     Based on information and belief, in 2001 or earlier, Dupont manufactured, produced, marketed, and sold PFOA and/or PFAS feedstocks to some or all of the AFFF product manufacturers, which were included in their AFFF products that were discharged into the environment and contaminated Plaintiff's drinking water supplies.

49.     DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[9]

50.     By December 2005, the E.P.A. uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the E.P.A. announced the "Largest Environmental Administrative Penalty in Agency History."[10] The E.P.A. fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the E.P.A. substantial risk information about chemicals they manufacture, process, or distribute in commerce."[11]

51.     By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[12] between PFOA

---

[9] EPA, E.I. DuPont de Nemours and Company PFOA Settlements, available at https://www.epa.gov/enforcement/ei-dupont-de-nemours-and-company-pfoa-settlements.

[10] *Id.*

[11] *See* EPA, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on July 7, 2022).

[12] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[13]  By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

52.     In July 2015, E.I. du Pont de *Nemours* spun off its *chemicals* division, creating *Chemours*, a new publicly-traded company named The Chemours Company, once wholly owned by DuPont.  By mid- 2015, DuPont had dumped its perfluourinated chemical liabilities into the lap of the new Chemours Company.

53.     Defendants also knew or should have known that: (a) users of AFFF would likely include fire and rescue training organizations and their personnel; (b) fire and rescue personnel were foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training and real-life fire emergency scenarios; (c) PFOA and PFOS are dangerous to the environment and human health when used by fire and rescue personnel; (d) fire and rescue personnel foreseeably lacked knowledge of these dangers; and, (e) fire and rescue personnel would require warnings of these dangers and/or affirmative instructions in the use of AFFF.

54.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, purchased, supplied, and/or sold PFOA/PFOS; (2) issued instructions on how AFFF should be used and disposed of; (3) failed to recall and/or warn the users of AFFF of the dangers to human health that result from the standard use and disposal of these products; negligently designed products containing or degrading into PFOA and/or PFOS; and (5) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF

---

[13] *See* The C8 Science Panel, "*Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project*," available at
http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last accessed on July 7, 2022).

containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS.

55.     As a direct result of Defendants' acts alleged in this Complaint, Plaintiff suffered severe health effects caused by exposure to AFFF containing PFOA and/or PFOS. As a direct and proximate result, Plaintiff has incurred, and will continue to incur, substantial harm, both economic and non-economic.

56.     Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their potential human health impacts before they sold such products. They also had a duty and breached their duty to minimize the risk of harm to human health caused by PFOA and PFOS.

D.     *OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM PFAS LIABILITIES*

57.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

58.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

59.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

60.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation

20

to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

61.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

62.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

63.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

64.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

65.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

66. Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

67. Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

68. In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

69. Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

70. By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

71. Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

72. Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related

to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

E.    *THE IMPACT OF PFOA AND PFOS ON THE PLAINTIFF*

73.    As a firefighter, Mr. Stephens received extensive firefighting training and participated in numerous firefighting activities that involved AFFF. For 22 years, Mr. Stephens regularly handled and used AFFF during training exercises and firefighting activities and often cleaned up spills of AFFF. Throughout the course of these activities, Mr. Stephens used AFFF in accordance with all product instructions and directions.

74.    Mr. Stephens was diagnosed with testicular cancer, hyperthyroid disease, and sterility.

75.    The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiff's exposure to PFOA and PFOS, which caused Mr. Stephens' testicular cancer and hyperthyroid disease.

76.    Therefore, as a direct and proximate result of Defendants' tortious conduct as discussed in this complaint, Plaintiff was physically harmed and is damaged in the following ways:

a.    Mr. Stephens suffered, and continues to suffer, physical pain and mental anguish;

b.    Mr. Stephens was rendered sterile by his testicular cancer;

c.    Mr. Stephens incurred hospital, medical, pharmaceutical and other expenses;

d.    Mr. Stephens endured painful surgery and two years of treatment for testicular cancer;

e.    Mr. Stephens will continue to suffer – and incur additional costs – for the foreseeable future as a result of hyperthyroid disease;

f.    Mr. Stephens suffers undue stress from the fear that his cancer may recur and that he may develop additional health conditions.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

77.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

78.    Defendants designed, manufactured, formulated, packaged, distributed, promoted, marketed, and/or sold products containing PFOA/PFOS contaminants.

79.    Defendants represented, asserted, claimed and warranted that AFFF products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

80.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of PFOA/PFOS contaminants, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

81.    Plaintiff used Defendants' Fluorosurfactant Products in a reasonably foreseeable manner and without substantial change in the condition of such products.

82.    Defendants knew, or should have known, that use of AFFF in its intended manner would result in exposures and personal injuries to users including Plaintiff.

83.    The PFOA/PFOS-containing products used by Plaintiff were defective in design and unreasonably dangerous because, among other things: PFOA and PFOS are bioacculative and toxic; and human exposure to PFOA and/or PFOS is associated with serious medical conditions including testicular cancer and thyroid disease..

84.    Therefore, as a direct and proximate result of Defendants' defective design of AFFF, Plaintiff was physically harmed and is damaged in the following ways:

a.    Mr. Stephens suffered, and continues to suffer, physical pain and mental anguish;

b.    Mr. Stephens was rendered sterile by his testicular cancer;

24

c.    Mr. Stephens incurred hospital, medical, pharmaceutical and other expenses;

d.    Mr. Stephens endured painful surgery and two years of treatment for testicular cancer;

e.    Mr. Stephens will continue to suffer – and incur additional costs – for the foreseeable future as a result of hyperthyroid disease;

f.    Mr. Stephens suffers undue stress from the fear that his cancer may recur and that he may develop additional health conditions.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

85.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

86.    As manufacturers, distributors, suppliers, sellers and marketers of PFOA/PFOS contaminants, Defendants had a duty to issue warnings of the risks posed by PFOA and/or PFOS to users and bystanders, including Plaintiff.

87.    Defendants knew that PFOA/PFOS contaminants would be purchased transported, stored, handled, and used without notice of the hazards which PFOA/PFOS pose to human health

88.    Defendants breached their duty to warn by unreasonably failing to provide warnings about potential and/or actual exposure to PFOA and/or PFOS, despite the fact that Defendants knew that these contaminants were in AFFF.

89.    Plaintiff was exposed to PFOA/PFOS in Defendants' Fluorosurfactant Products including AFFF.

90.    Plaintiff used Fluorosufactant Products in a reasonably foreseeable manner and without substantial change in the condition of the products.

91.    Defendants' Fluorosurfactant Products were defective in design and unreasonably dangerous products for the reasons set forth above.

92.     Despite the known and/or foreseeable human health hazards associated with exposure to PFOA/PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate those hazards.

93.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFOA/PFOS contaminants or otherwise.

94.     Therefore, as a direct and proximate result of Defendants' failure to warn, Plaintiff was physically harmed and is damaged in the following ways:

a.      Mr. Stephens suffered, and continues to suffer, physical pain and mental anguish;

b.      Mr. Stephens was rendered sterile by his testicular cancer;

c.      Mr. Stephens incurred hospital, medical, pharmaceutical and other expenses;

d.      Mr. Stephens endured painful surgery and two years of treatment for testicular cancer;

e.      Mr. Stephens will continue to suffer — and incur additional costs — for the foreseeable future as a result of hyperthyroid disease;

f.      Mr. Stephens suffers undue stress from the fear that his cancer may recur and that he may develop additional health conditions.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

95.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

96.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of PFOA/PFOS contaminants, Defendants owed a duty to Plaintiff and all persons whom Defendants' products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of PFOA/PFOS contaminants.

97.    Despite the fact that Defendants knew that PFOA and PFOS are Bioaccumulative, toxic, and can cause testicular cancer, thyroid disease, and other serious human health effects, Defendants negligently:

a.    designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFOA/PFOS-containing products;

b.    issued instructions on how AFFF products should be used and disposed of, thus improperly permitting human exposure to PFOA and/or PFOS;

c.    failed to recall and/or warn the users of AFFF products of the dangers of human exposure associated with intended use and disposal of this product; and

d.    failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS regarding the proper use, handling, and disposal of products containing this toxic chemical, notwithstanding the fact that Defendants know the identity of the purchasers of the AFFF products.

98.    As a direct and proximate result of Defendants' negligence, Plaintiff was physically harmed and is damaged in the following ways:

a.    Mr. Stephens suffered, and continues to suffer, physical pain and mental anguish;

b.    Mr. Stephens was rendered sterile by his testicular cancer;

c.    Mr. Stephens incurred hospital, medical, pharmaceutical and other expenses;

d.    Mr. Stephens endured painful surgery and two years of treatment for testicular cancer;

e.    Mr. Stephens will continue to suffer -- and incur additional costs -- for the foreseeable future as a result of hyperthyroid disease;

f.    Mr. Stephens suffers undue stress from the fear that his cancer may recur and that he may develop additional health conditions.

## FOURTH CAUSE OF ACTION
## FRAUDULENT TRANSFER (UFTA DEFENDANTS)
### (Against DuPont and Chemours)

99.     Plaintiff realleges and reaffirms each and every allegation set forth in the all proceeding paragraphs as if fully restated in this cause of action.

100.     Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UFTA") as adopted by the State of Florida in Fl. Stat. Ann. Ch. 726.101-112, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UFTA Defendants").

101.     Pursuant to Fl. Stat. Ann. Ch. 726.101-112, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

102.     With actual intent to hinder, delay, or defraud any creditor of the debtor; or

103.     Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

104.     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

105.     Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

106.     Further, the statute states, in part, that "[i]n determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether: […] before the

28

transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; the transfer was of substantially all the debtor's assets; […] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

107.    Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly-owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

108.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

109.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

110.    The UFTA Defendants acted with actual intent to hinder, delay and to defraud any creditor of the UFTA Defendants because: (1) they were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

111.    The UFTA Defendants engaged in actions in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of Plaintiff, and other similar parties,

that have been damaged as a result of UFTA Defendants' conduct, omissions, and actions described herein.

112.    As a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

113.    Pursuant to Fl. Stat. Ann. Ch. 726.101-112, Plaintiff seeks avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

114.    Plaintiff further seeks all other rights and remedies that may be available to it under UFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

115.    Plaintiff respectfully prays for judgment against Defendants, jointly and severally, as follows:

a.      Compensatory damages and all other special damages according to proof including, but not limited to past and future medical and treatment costs; non-economic damages; loss of earnings and future earnings; and household expenses, among others.

b.      Avoiding the transfer of DuPont's liabilities for claims brought in this Complaint;

c.      Exemplary and Punitive damages;

d.      Attorney's fees;

e.      Pre-judgment and post-judgment interest;

f.      Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a jury trial.


Dated:  May 23, 2023

/s/  *Louise R. Caro*
**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
Louise R. Caro (FLA Bar 633380)
lcaro@cossichlaw.com
Philip F. Cossich, Jr. (LA Bar 1788)
pcossich@cossichlaw.com
(*Pro Hac Vice* pending)
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
(504) 394-9000

**BARON & BUDD, P.C.**
Scott Summy (TX Bar 19507500)
(*Pro Hac Vice* pending)
Ssummy@baronbudd.com
Carla Burke Pickrel (TX Bar 24012490)
(*Pro Hac Vice* pending)
cburkepickrel@baronbudd.com
Brett Land (TX Bar 24092664)
(*Pro Hac Vice* pending)
bland@baronbudd.com
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219-4281
Telephone: (214) 521-3605

*Attorneys for Plaintiff*

31